# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**TIMOTHY SCHWARTZ,**

>    **Plaintiff,**

>    **v.**                                    **Case No. 22-CV-00321-SCD**

**KILOLO KIJAKAZI,**
*Acting Commissioner of Social Security,*

>    **Defendant.**

## DECISION AND ORDER

Plaintiff Timothy Schwartz applied for social security disability insurance benefits (DIB) and supplemental security income (SSI) due to various physical and mental impairments. His claim was denied, and the denial was affirmed following a hearing before an Administrative Law Judge (ALJ) employed by the Social Security Administration (SSA). Schwartz now seeks judicial review of the ALJ's decision because he believes that the ALJ did not properly consider subjective evidence in assessing Schwartz's credibility, failed to consider all relevant evidence in determining Schwartz's residual functional capacity (RFC), and did not follow the proper standards to evaluate the persuasive value of different medical opinions. Kilolo Kijakazi, the Acting Commissioner of the SSA, maintains that the ALJ did not commit reversible error. I agree with Kijakazi and therefore affirm the SSA's denial of benefits.

## BACKGROUND

### I.    Application Process and the Hearing Before ALJ Rouf

Schwartz filed for SSI and DIB on July 23, 2020, alleging disability since May 22, 2020. R. 14.[1] Schwartz's DIB/SSI claims were denied initially on September 1, 2020, and on reconsideration December 29, 2020. *Id*. Schwartz then had the opportunity to present his case to an ALJ on May 28, 2021. *Id*.

Schwartz was forty-two years old at the time of the hearing before the ALJ. R 44. He has two school-aged children that live with him fifty percent of the time. R. 46-47. Schwartz completed school through eleventh grade. R. 47. He last worked at a fiberglass factory in May of 2020, but had to leave due to the surgical amputation of his big toe. *Id*. Prior to that, he worked in several other jobs involving heavy machinery in different factories. R. 47-54. In these roles, he was on his feet all day. R. 51. In May 2020, Schwartz had to leave these jobs due to the amputation of his big toe due to severe diabetic ulcers of his feet that led to an infection. R. 54. Around the same time, he underwent shoulder surgery due to frozen shoulder syndrome, which "put [him] out of work for about six weeks." *Id*. Schwartz testified that the amputation of his toe made it difficult to balance, and his shoulder still had a limited range of motion post-surgery. R. 54-55. He also had a hard time lifting more than thirty pounds due to his shoulder problems. R. 55-56.

Schwartz also testified about the treatment of his diabetes. His diabetes had led to kidney disease, ulcers of his feet, and neuropathy in his feet. R. 56. Schwartz testified that his neuropathy caused a burning sensation on his feet that "sometimes" affects his ability to stand and walk. R. 70. Schwartz also had to test his blood sugar four to six times a day and takes three kinds of medication for his diabetes. R. 56. Schwartz stated that the amputation of his toe was a "wake-up call" that led him to be more compliant with his medication regimen, and

---

[1] The transcript is filed on the docket at ECF No. 12 to ECF No. 12-18.

that he had been more consistent with his treatment since the amputation. R. 57. Schwartz also testified to high blood pressure that made him dizzy and affected his kidneys and eyesight. *Id*.

Schwartz testified about his mental health difficulties. He explained that he gets panic attacks that could lead to asthma attacks or make him lash out at people "like a Dr. Jekyll and Mr. Hyde thing." R. 58. These could be triggered by low blood sugar or seeing his ex-wife. R. 59. He treated these attacks by walking away from the situation or taking a break, and also took medications that he testified helped alleviate his symptoms. R. 60-61. However, he also testified that the medications make him drowsy. R. 61. Schwartz also testified about past difficulty getting along with coworkers and explained that when he gets anxious at work, he would "probably use every foul language underneath the sun to express how [he] feel[s]." R. 66. He also saw several mental health professionals. R. 61-62.

Schwartz testified about his daily activities, which included waking his children up and getting them to school, visiting his sister and her kids, helping his kids with homework, cooking, and watching TV. R. 62-63. On weeks that he didn't have his children with him, he made meals, vacuumed, did laundry, and "normal picking up housework" that sometimes made him dizzy if performed for too long. R. 63-64. Schwartz testified that he was able to grocery shop, drive, play games on his phone, and play with his kids. R. 64. On prompting from his attorney, Schwartz noted that he could not do things like washing dishes or doing laundry on a full-time basis "because [he] get[s] distracted too easily" and "get[s] overwhelmed." R. 65.

A vocational expert (VE) also testified at the hearing. The VE classified Schwartz's past work as a machine operator, production helper, sausage maker, material handler, control

machine operator, and hand sander. R. 79. The VE testified that a person with an even less restricted RFC than the one ultimately assigned to Schwartz would not be able to perform any of this past work. R. 81. However, she also testified that an individual with the RFC ultimately assigned to Schwartz could perform several other jobs available in the national economy, including as an assembler, a final assembler, and a document preparer. R. 82.

## II. The ALJ's decision

In applying the five-step disability evaluation framework,[2] the ALJ found at step one that Schwartz had not engaged in substantial gainful activity during the relevant period. R. 17. At step two, he found that Schwartz had the following severe impairments: type II diabetes mellitus; osteomyelitis of the right big toe status post-amputation; diabetic ulcers of the bilateral feet; asthma; right shoulder disorder status post-surgery; obesity; generalized anxiety disorder; mood disorder; and major depressive disorder. *Id*. The ALJ also noted that there were several medically determinable impairments that were non-severe because they did not result in more than minimal effects on the Schwartz's ability to perform ordinary activities. *Id*. These non-severe conditions included hypertension, chronic kidney disease, diabetic macular edema, moderate non-proliferative retinopathy, and obstructive sleep apnea. *Id*. At step three, the ALJ determined that none of these impairments singly or in combination met or equaled a Listing-level impairment. R. 18-19.

At step three, the ALJ also considered Schwartz's mental functioning in the four paragraph B categories. He found that Schwartz had a mild limitation in understanding, remembering, and applying information, and moderate limitations in interacting with others; concentrating, persisting, and maintaining pace; and adapting and managing himself. R. 19-

---

[2] 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) outline the process for evaluating claims.

20. In relation to interacting with others, the ALJ noted that objective exam findings in this area were normal, Schwartz had no apparent difficulty communicating and cooperating with care providers, and both state agency consultants found that he had no more than a moderate limitation in this area. R. 20. In relation to concentrating, persisting, and maintaining pace, the ALJ also stated that objective exam findings showed normal functioning, logical thought processes, and intact attention skills, and state agency consultants concluded that Schwartz had, at most, a moderate limitation. *Id.*

The ALJ then determined that Schwartz had the residual functional capacity (RFC) to perform sedentary work with additional physical and mental limitations. R. 21. Additional physical limitations included occasional climbing ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; occasional reaching overhead with the right arm; and never climbing ladders, ropes, or scaffolds. *Id.* Additional mental limitations included only performing simple and routine tasks; maintaining attention and concentration for two-hour segments; making simple work-related decisions; tolerating occasional changes in the workplace; and no more than occasional interaction with other people. *Id.* In determining the RFC, the ALJ engaged in a two-step process to evaluate Schwartz's symptoms; first, he determined that Schwartz's medically determinable impairments could reasonably be expected to cause Schwartz's symptoms, but then concluded that Schwartz's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the record. R. 22.

In concluding that Schwartz's symptoms did not limit him as severely as alleged, the ALJ observed that Schwartz was able to perform several normal daily activities and that objective exam findings supported an ability to work within the limitations in the RFC. The

ALJ cited to the functional report completed by Schwartz in which he listed an ability to walk two miles before taking a break, perform household chores, drive, manage his finances, and take care of his children. R. 22 (citing Ex. 4E, Function Report completed by Schwartz). The ALJ considered a third-party statement from Schwartz's mother regarding Schwartz's history of learning and emotional difficulties. *Id*. (citing Ex. 11E). The ALJ then referenced patterns throughout Schwartz's medical records, including normal, independent ambulation, normal muscle strength and range of motion, normal mental examination findings, improvement in symptoms related to his foot ulcers, normal heart and lung function, and no signs of acute distress. R. 22-26. The ALJ noted that Schwartz regularly had a BMI greater than 40 kg/m$^2$ and noted that his obesity would affect his functional limitations. R. 25.

The ALJ also discussed Schwartz's mental limitations. He observed that Schwartz had a documented history of depression and anxiety but on examination, he still demonstrated "mental functioning that was well within functional limits." *Id*. In keeping with this normal mental functioning, the ALJ described notes from Schwartz's counselor. *Id*. The counselor's notes reflect that Schwartz reported a "pretty good mood" despite interpersonal difficulties with his girlfriend, and that Schwartz's depression was "treated using a conservative regimen of routine mental health medications." *Id*. (citing Ex. 1F). The ALJ also discussed the opinions of state agency examiners and consultants, none of whom found Schwartz to have greater limitations than those recognized by the ALJ. R. 26-27. After considering all this evidence related to Schwartz's physical and mental limitations, the ALJ stated that "[t]he objective evidence supports the residual functional capacity," which limited Schwartz to a reduced range of sedentary work with additional mental limitations. R. 27.

The ALJ then moved on to explain the persuasive value of different medical opinions in the record. R. 26-27. Both state agency psychological consultants found that Schwartz had no more than moderate limitations in interacting with others. R. 26. One state agency psychological consultant found only a mild limitation in concentration, persistence, and pace, and the other found a moderate limitation. *Id*. The ALJ found these opinions somewhat persuasive as they were consistent with the longitudinal objective evidence of mental health problems and normal mental functioning despite those problems. R. 27. With respect to the state agency consultants evaluating Schwartz's physical health, the ALJ found their opinions "generally unpersuasive." *Id*. These consultants had found Schwartz capable of light exertional work with few additional limitations. The ALJ found that these were inconsistent with objective evidence of uncontrolled diabetes that led to neuropathy, foot ulcers, and the amputation of Schwartz's big toe, and inconsistent with Schwartz's shoulder limitations post-surgery. *Id*. The ALJ then stated that the opinion of Kirsten Winger, DNP, (Schwartz's primary care provider) was unpersuasive because her statements that Schwartz would be off task 25% of the workday and could only sit/stand/walk thirty minutes at a time were inconsistent with objective medical evidence. R. 27-28.

The ALJ found at step four that Schwartz could not perform any of his past work but found at step five that he could perform other jobs available in significant numbers in the national economy. R. 28. The ALJ determined that Schwartz could perform work as a final assembler or document preparer, and as such, was not disabled. R. 29-31.

The Appeals Council denied Schwartz's request for review on January 19, 2022, *see* R. 1-7, making the ALJ's decision a final decision of the Commissioner. *See Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

On March 14, 2022, Schwartz filed this action seeking judicial review of the decision denying his claim under 42 U.S.C. § 405(g). *See* ECF No. 1. His case was assigned to Judge Adelman, who reassigned it to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF No. 3-5. Schwartz filed a brief in support of his claim, ECF No. 13; Kijakazi filed a brief in support of the ALJ's decision, ECF No. 21; and Schwartz filed a reply brief, ECF No. 22.

## APPLICABLE LEGAL STANDARDS

Under 42 U.S.C. § 405(g), a claimant may seek judicial review of a final administrative decision of the Social Security Commissioner.  In such a case, a judge has the power to affirm, reverse, or modify the Commissioner's final decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991).

The court will reverse the Commissioner's final decision only if the denial of disability benefits is "based on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). The court "may not re-weigh the evidence or substitute its own judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). It is limited to evaluating whether the ALJ has built an "accurate and logical bridge between the evidence and the result." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

Substantial evidence is not a high bar. It is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Martin*, 950 F.3d at 373. The ALJ simply "must rest its denial of benefits on adequate evidence contained in the record and must

explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). In explaining why the evidence contrary to his conclusion does not persuade, the ALJ need not address every piece of evidence in the record, but he also cannot ignore an entire line of evidence contrary to his reasoning. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Likewise, an ALJ "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

## DISCUSSION

### I. Symptom Evaluation in Credibility Determination Under SSR 16-3p

Schwartz first argues that the ALJ erred by finding that his statements regarding the intensity, persistence, and limiting effects of his symptoms were inconsistent with other evidence in the record. Specifically, he argues that the ALJ overvalued objective medical evidence and disregarded key subjective evidence. Because the ALJ adequately considered subjective evidence and based his decision on substantial evidence, I find that the ALJ did not reversibly err in evaluating Schwartz's subjective symptoms.

SSR 16-3p directs ALJs to first evaluate whether a claimant's medically determinable impairments could reasonably be expected to cause the reported symptoms, and then directs them to evaluate the intensity and persistence of the symptoms. In the second portion of this inquiry, ALJs may consider objective medical evidence, the claimant's statements regarding symptoms such as pain, evidence of the claimant's daily activities, factors that precipitate or aggravate symptoms, medication and other treatment, and "any other factors concerning an individual's functional limitations." SSR 16-3p. In particular, objective medical evidence "is a useful indicator . . . in making reasonable conclusions about the intensity and persistence of

[a claimant's] symptoms, such as pain." 20 CFR § 404.1529(c)(2). That said, an ALJ cannot "reject [a claimant's] statements about the intensity and persistence of [] symptoms . . . *solely* because the available medical evidence does not substantiate [the claimant's] statements." *Id.* (emphasis added).

Here, the ALJ reasonably determined that Schwartz's statements about the intensity and persistence of his symptoms were not entirely consistent with the evidence in the record. The ALJ's conclusions on this point were based on substantial evidence and did not ignore an entire line of evidence supporting disability.

The ALJ found that Schwartz's statements about the intensity, persistence, and limiting effects of his symptoms were not consistent with the record. R. 22. For one, Schwartz engaged in normal daily activities that did not support a finding of disability, including wlaking, performing household chores, driving, managing his finances, and taking care of his children. R. 22 (citing Ex. 4E, Function Report completed by Schwartz). And Schwartz is correct that the ALJ relied heavily on objective medical evidence to support his RFC finding; the ALJ explained that Schwartz's testimony of disabling symptoms did not align with his medical history showing normal, independent ambulation, normal muscle strength and range of motion, normal mental examination findings, improvement in symptoms related to his foot ulcers, normal heart and lung function, and no signs of acute distress. R. 22-26. The ALJ also heavily relied on objective mental exam findings, including "mental functioning that was well within functional limits," the counselor's notes that Schwartz reported a "pretty good mood," Schwartz's largely successful treatment of his conditions with medication, and normal state agency psychological consultant findings.

But Schwartz is incorrect that such reliance on objective medical evidence instead of Schwartz's subjective complaints was an error. *See e.g., Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007) ("Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."). The majority of evidence that Schwartz cites in his favor is his own testimony, which crucially, the ALJ *did* consider. The ALJ found Schwartz to be more limited in his physical restrictions than either state agency consultant found *based on Schwartz's testimony* regarding his foot ulcers and neuropathy. But, in spite of limitations from those conditions, the still found that a sedentary RFC adequately accommodated those complaints.

Nevertheless, Schwartz argues that the ALJ conducted an inadequate analysis by failing to consider non-objective evidence. He then offers a long laundry list of evidence that he feels supports his case and should have been more thoroughly addressed. This evidence includes Schwartz's testimony of burning in his feet (consistent with diabetic neuropathy), his primary care provider's assessment, his long work history, testimony of his daily activities, testimony of difficulty balancing, testimony describing panic attacks, evidence of obesity, and evidence of medication side effects.

As a general pattern in the arguments discussed below, Schwartz does not fully articulate why he believes the RFC did not adequately address his limitations; he merely asserts that the ALJ did not consider some piece of evidence, and that requires reversal. However, as explained above, the ALJ addressed evidence from several sources, including evidence supporting significant symptoms. Schwartz's "'needless nitpicking' . . . does not shake the conclusion that substantial evidence supports the ALJ's determination." *Gedatus v.*

*Saul*, 994 F.3d 893, 901 (7th Cir. 2021) ("[T]rue, the record contains evidence that could be construed as favorable to Gedatus. But the ALJ noted some of that evidence and sided with her to a degree by determining she had severe impairments and needed some limitations. . . This is not a case where an ALJ ignored evidence contrary to his conclusion.").

Even though I find that the ALJ had substantial evidence for his determination and did not ignore evidence contrary to his conclusion, I will briefly address each of Schwartz's arguments for the sake of thoroughness.

### A.        Foot Neuropathy

Schwartz asserts that the ALJ erred by relying on objective evidence and failing to discuss Schwartz's loss of sensation in his feet and foot ulceration. While the ALJ did reference objective findings like normal extremity strength, independent ambulation, and the improvement of Schwartz's foot ulcers with treatment, the ALJ did also document Schwartz's neuropathy and ulcers and accommodated them in the RFC. To put it plainly, Schwartz is just wrong to say that the ALJ ignored his neuropathy and foot ulcers.

The ALJ recognized that Schwartz had severe uncontrolled diabetes mellitus that resulted in secondary severe issues, including "lower extremity diabetic neuropathy and recurrent foot ulcers." R. 23. He also explained that on examination, Schwartz had numbness in his toes and feet, consistent with severe diabetic neuropathy. R. 24. Finally, and most importantly, the ALJ credited Schwartz's testimony of chronic neuropathy and foot ulcers to reject the state agency consultants' findings that, based on objective medical evidence, Schwartz could stand or walk four to six hours in a workday. The ALJ chose to instead limit Schwartz to sedentary work to accommodate Schwartz's neuropathy and ulcers. R. 27. There is no indication that the ALJ disregarded this evidence.

### B.       Dr. Winger's Opinion

As part of the Social Security review process, Schwartz obtained an opinion from his primary care provider, DNP Kirsten Winger, regarding his functioning. Schwartz recognizes that the ALJ considered Winger's opinion and found it unpersuasive;[3] however, he also argues that the ALJ had a responsibility to examine Winger's opinion for *non*-opinion evidence regarding "the nature of Schwartz's symptoms, aggravating factors, frequency and duration, change over time, and daily activities" in order to compare that non-opinion evidence "with the other statements made by the claimant and the other evidence in the record as part of the SSR 16-3p analysis." ECF No. 13 at 15.

This argument is legally baseless. In effect, Schwartz suggests that the regulations require the ALJ to mine every medical opinion for every possible factual nugget that supports the claimant's position. In addition to being unsupported by law, this proposition would pose an exceedingly burdensome task on ALJs generally, and in this case especially, where the administrative record exceeds 4000 pages. ALJs have never been required to specifically address every piece of evidence in the record, and the interpretation that Schwartz proposes goes even farther by suggesting that an ALJ must address every piece of factual evidence *within* every piece of opinion evidence.

Furthermore, to the extent this opinion even contains non-opinion evidence, it merely repeats symptoms described elsewhere in the record. The Winger opinion contains no unique evidence regarding the "nature of Schwartz's symptoms, aggravating factors, frequency and duration, change over time, and daily activities;" it is just his provider's *summary* of Schwartz's limitations. *See* R. 3827 (describing dizziness and fatigue as a reported side effect of his

---

[3] Schwartz separately argues that the ALJ erred by not finding Winger's opinion persuasive; this argument will be addressed in Section III.

medications); R. 2828 (describing low concentration as an observed functional limitation that could restrict employment in a competitive work situation). In short, the ALJ did not err by declining to discuss individual statements in Winger's opinion when he adequately explained his reasoning for discounting the opinion.

### C. Work History

Next, Schwartz claims that the ALJ erred by not considering Schwartz's twenty-year work history as a factor supporting his credibility because the Seventh Circuit has previously held that "a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." ECF No. 13 at 15 (quoting *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016)). However, while an ALJ *may* cite to an individual's work history in the credibility assessment, he is by no means required to do so. *See Summers v. Berryhill*, 864 F.3d 523, 529 (7th Cir. 2017) ("Although a consistent work history weighs in favor of a positive credibility finding, it is still just 'one factor among many, and it is not dispositive.'" (quoting *Loveless*, 810 F.3d at 508)). Not discussing a claimant's work history in relation to the claimant's credibility in a symptoms assessment is not reversible error. *Id*.

### D. Daily Activities

Schwartz next alleges not that the ALJ did not consider his daily activities, but that the ALJ did not consider the way in which Schwartz performed these activities: slowly and with difficulty. Similar to Schwartz's earlier argument about Winger's opinion, this needlessly parses out the established standard and does not constitute reversible error.

The ALJ considered Schwartz's daily activities to suggest that his RFC did not warrant greater limitations. These activities included preparing meals; chores like dishwashing, cleaning, and laundry; driving; shopping; managing his finances, and care for his school-aged

children. R. 22. Schwartz protests that his ability to perform these activities is limited because he testified that he gets dizzy and lightheaded if he does chores for too long, that he is easily overwhelmed and has panic attacks when rushed, and that he has difficulty focusing or finishing tasks. By not addressing this, Schwartz argues, "[t]he ALJ improperly inferred from Schwartz's ability to engage in various activities that he performs in a manner that fits *within his limitations*, that Schwartz is therefore somehow capable of performing such tasks on a full-time, competitive basis." ECF No. 13 at 16 (emphasis added). But this misses the key point of an RFC determination: the ALJ determines what work a claimant can perform *within his limitations*. The ALJ did not determine that Schwartz could be a full-time dishwasher because he occasionally washed dishes, or that he could be a full-time taxi driver because he occasionally drove and interacted with a small subset of people. The ALJ determined that because Schwartz could perform certain daily activities, he could very likely perform less strenuous and less stressful activities in a work capacity on a more regular basis. Schwartz does not specify the ways in which he believes the limitations in the RFC did not align with his demonstrated limitations in performing daily activities; he simply asserts in a conclusory fashion that the ALJ did not account for his limitations. As such, I find that he has not demonstrated that the ALJ reversibly erred.

### E.        Balancing Difficulty

Next, Schwartz alleges that the ALJ disregarded his complaints of dizziness, numbness in his feet, and the amputation of his big toe in finding that he could balance occasionally. While I do not believe the ALJ disregarded such evidence, any hypothetical error in doing so was harmless. An error is harmless if the court is convinced that the ALJ would reach the same result on remand. *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). The

ALJ found that Schwartz was not disabled at step five because he could perform the jobs of final assembler and document preparer. R. 29. The DOT descriptions for both jobs state that balancing is not required. ECF Nos. 21-2, 21-3. Here, even if the case were remanded and the ALJ limited Schwartz to never balancing, the result would be the same: Schwartz could still perform the jobs of final assembler and document preparer, and as such, would not be disabled.

### F.        Panic Attacks

Schwartz next alleges that the ALJ "failed to analyze the aggravating factors." He then states that he testified to getting multiple panic attacks per week that are brought on by low blood sugar, interacting with his ex-wife, or working at a fast pace. Schwartz does not specify what exactly he wanted the ALJ to do with this information beyond suggesting that it evinces an inability to respond appropriately to coworkers and supervisors. But the ALJ already knew that; he already recognized that Schwartz's panic attacks imposed moderate limitations on his ability to interact with others and his ability to concentrate, persist and maintain pace. *See* R. 22 ("The claimant testified to a history of depression and anxiety, including a history of panic attacks, all of which limited his ability to interact with others, remember information, and perform daily tasks.").

The ALJ recognized Schwartz's limitations on interacting with others and limited his RFC to only occasional interaction with other people. The ALJ also recognized Schwartz's limitation in concentration, persistence, and pace, and accounted for it by limiting Schwartz to simple and routine tasks, simple work-related decisions, only occasional workplace changes, and focusing for only two-hour segments at a time. Schwartz does not confront any of these limitations in the RFC or explain how they do not adequately address his restrictions.

Accordingly, I find that the ALJ did address the limitations caused by Schwartz's panic attacks, and Schwartz has failed to demonstrate that the ALJ erred.

### G. Obesity

The ALJ noted Schwartz's obesity and limited him to a very limited set of sedentary work. Schwartz alleges that the ALJ's assessment of his obesity was "meaningless boilerplate that offers no insight as to the actual impact the claimant's severe impairment of obesity especially in light of the severe neuropathy and recurrent ulcers of the bilateral feet, great toe amputation, his issues with dizziness, and balance issues." ECF No. 13 at 18. However, once again, it is unclear how Schwartz believes the ALJ's determination did not account for his obesity in conjunction with his other conditions. "[A] failure to consider the effect of obesity is subject to harmless-error analysis." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It was Schwartz's burden to prove that this error was not harmless. In other words, Schwartz cannot just assert that it was error for the ALJ to not address his obesity, he had to show that the ALJ would have reached a different outcome if he considered Schwartz's obesity in more depth. Not only does Schwartz fail to prove harmful error, he fails to even make the argument. *See also Gedatus*, 994 F.3d at 905 (affirming the ALJ's decision when claimant "failed to show how her medically determinable impairments caused any limitations beyond those the ALJ found."). Because Schwartz has not shown how the ALJ failed to accommodate his obesity, I find that he has failed to demonstrate reversible error.

### H. Medication

Finally, Schwartz asserts that the ALJ did not consider the side effects of his medications, including being "knocked-out" for hours after taking emergency anti-anxiety medication, and drowsiness and increased urination frequency with other medications.

Schwartz asserts that the ALJ erred by failing to consider how these side effects affect Schwartz's ability to perform work activities. There is no indication that any of these side effects would more than minimally impact Schwartz's functioning. Additionally, the only support for this point is Schwartz's own testimony, and the ALJ explained why he did not find Schwartz's subjective testimony as a whole to be consistent with the other evidence in the record. As such, Schwartz has not demonstrated that this omission constitutes reversible error.

## II. RFC and Absenteeism

Schwartz next argues that the ALJ erred in failing to address his absenteeism. Schwartz argues that the evidence demonstrates that he would be absent more often than any employer would tolerate. He states that from May 2020 to April 2021, he had an average of six medical appointments per month, and that the VE testified that most employers would *maybe* tolerate one absence per month, but not six. However, there is a clear leap in logic here: Schwartz is operating under the assumption that each doctor's appointment results in a day absent from work.

I do not need to decide whether so many absences would preclude Schwartz from participating in the workforce because Schwartz has not demonstrated that each appointment "require[d] [him] to miss a full day of work or that he could not schedule his appointments outside of working hours." *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018). There is no reason to assume that Schwartz could not schedule doctor's appointments outside of working hours or during a lunch break. *See Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000) (finding no reversible error where an ALJ did not consider absenteeism in the RFC based on a plaintiff's speculation that she would miss one day of work for each appointment.). Schwartz

argues in his reply brief that his provider does not schedule outside of normal working hours, but at least one of the listed providers has hours from 7:30 am to 6 pm. As such, the ALJ did not err in declining to consider his purported absenteeism in the RFC assessment.

### III. Persuasive Value of Medical Opinions

Lastly, Schwartz alleges that the ALJ improperly evaluated the persuasive value of several medical opinions, including Winger's earlier-mentioned opinion, and the opinions of doctors completing assessments for Schwartz's worker's compensation (WC) claim.

ALJs must consider various factors in evaluating the persuasive value of medical opinions, the most important of which are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Supportability concerns how internally well-supported the opinion is by objective medical evidence. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Consistency is the degree to which a medical opinion comports with all evidence in the record. C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). An ALJ must discuss both factors in evaluating the persuasive value of a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). In explaining the persuasive value of the evidence, an ALJ must only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

The ALJ explained that he did not find Winger's opinion persuasive because it was "not consistent with the longitudinal objective evidence." R. 27-28. Schwartz argues that the ALJ once again overemphasized the value of objective evidence over subjective evidence. Schwartz argues that Winger's opinion that he had serious limitations related to off-task time was consistent with evidence like Schwartz's testimony of getting tired easily and needing to take breaks. And he may be correct. But that doesn't change the fact that it was *inconsistent*

with objective medical findings. Schwartz has effectively asked me to find that the ALJ should have relied on his subjective testimony rather than objective medical evidence to find Winger's opinion more persuasive, an impermissible request to reweigh evidence. The ALJ did not err by finding Winger's opinion unpersuasive and inconsistent with the evidence. *See also Givens v. Colvin*, 551 F. App'x 855, 861 (7th Cir. 2013) ("An ALJ may give less weight to an opinion that appears to rely heavily on the claimant's subjective complaints, even if the source of that opinion had examined the claimant.").

Schwartz also faults the ALJ for not addressing the opinions of doctors from Schwartz's WC claim regarding his shoulder. However, there is no indication that impairments related to the shoulder injury for which he filed a WC claim were not documented elsewhere in the record. In fact, the state agency consultants on whose opinion the ALJ relied, noted several limitations in Schwartz's shoulder that the ALJ adopted in the RFC. Because there is no indication that the WC doctors' opinions contained anything materially different than other medical opinions related to his shoulder, Schwartz has not demonstrated that not discussing these opinions was harmful error.

## CONCLUSION

For all of the reasons explained above, I find that (1) Schwartz has not demonstrated that the ALJ committed reversible error; and (2) substantial evidence supported the ALJ's decision. Thus, I **AFFIRM** the Commissioner's decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 31st day of March, 2023.

_____
STEPHEN C. DRIES
United States Magistrate Judge